UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHARLES M FORTMANN; ZEHRA CEVHER,

Plaintiffs,

-against-

ST. JOHN'S UNIVERSITY; MOSTAFA SADOQI,

Defendants.

**MEMORANDUM & ORDER**
24-CV-5494 (NRM) (LKE)

**NINA R. MORRISON**, United States District Judge:

Plaintiffs Charles Fortmann and Zehra Cevher bring this employment discrimination lawsuit against Defendants for age, religious, and sex discrimination. Specifically, Plaintiffs raise causes of action for discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"); they also bring retaliation claims under Title IX of the Education Amendments Act of 1972. In addition, Fortmann brings discrimination and retaliation claims under the Age Discrimination Employment Act ("ADEA"), and Cevher brings a *quid pro quo* sexual harassment claim under Title VII, as well as a discrimination claim under Title IX.

Before the Court is Defendant St. John's University's motion to dismiss under Fed. R. Civ. P. 12(b)(6). For the reasons discussed below, the following claims by

Fortmann are dismissed: (1) Title VII discrimination, (2) Title VII retaliation, (3) Title VII hostile work environment, (4) NYSHRL religious discrimination, (5) NYCHRL religious discrimination, (6) ADEA discrimination, (7) ADEA retaliation, (8) NYSHRL age discrimination. SJU's motion to dismiss is denied as to Fortmann's remaining claims. As for Cevher's claims, the motion to dismiss is denied in its entirety.

## BACKGROUND

Plaintiffs' allegations are detailed below in chronological order.

### *A. Factual Allegations Regarding Dr. Fortmann*

In July 2014, Dr. Fortmann was hired by SJU as a temporary, non-tenure track Associate Professor of Physics; he began his employment in September 2014. Compl. ¶¶ 35–36, ECF No. 1. By 2017, he was appointed as a full-time, five-year, tenure-track professor — a promotion that was accompanied by a $100,000 award to support his research, which included installing a superconducting magnet with a two-inch bore. *Id.* ¶¶ 38, 44–45.

Fortmann alleges that he was "subjected to a continuous practice and policy of discrimination" while at SJU. *Id.* ¶ 47. He specifically alleges that Defendant Mostafa Sadoqi — the Chair of the SJU Physics Department — regularly called him "old" and "burned out," accused him of lying about his religion (*i.e.*, pretending to be Catholic while in reality being Jewish), and questioned why Fortmann was still employed and conducting research at SJU. *Id.* ¶¶ 50–51, 55–59, 61.

Beginning as early as 2017 and into 2018, Fortmann began reporting Sadoqi to Human Resources ("HR") for his allegedly disparaging and discriminatory comments towards other faculty members and students. Sadoqi encouraged Fortmann to provide a negative recommendation for a female student, accusing her of lying and flirting with professors. *Id.* ¶¶ 84–88. Fortmann reported Sadoqi to HR for this on December 10, 2017 (and later in 2019, 2020, and early 2021). *Id.* ¶ 89. He also reported Sadoqi after overhearing him brag about firing a Black department secretary — after misrepresenting the semester's start date and allowing her to work from home during the first week of classes. *Id.* ¶¶ 97–99.

Fortmann continued to report Sadoqi to HR in late 2019 and early 2020. For instance, he did so after learning from a colleague (Dr. Arun Rajam) that Sadoqi allegedly sexually harassed a mutual female colleague — and had provided a negative evaluation for her prospective employer after she rebuffed his advances. *Id.* ¶¶ 65–70. He also reported Sadoqi to HR after Sadoqi told him that he would not renew Rajam's contract. *Id.* ¶¶ 72, 75. Sadoqi took issue with the fact that Rajam had encouraged students to complain directly to HR regarding sexual harassment by another SJU faculty member, instead of going through him. *See id.* ¶¶ 72–75. Sadoqi took similar action against an adjunct professor (Dr. Alex Safos) who advised students to report sexual harassment to HR — Fortmann reported Sadoqi for this as well. *Id.* ¶¶ 93–95.

As a result of Fortmann's HR reports, starting in 2018, Sadoqi began announcing his intentions to "get rid of" Fortmann and calling him the "villain of the

department," "old," and "burned out." *See id.* ¶¶ 100–06. One of his colleagues (Ms. Mary Ann Frohnhofer) informed Fortmann that Sadoqi planned to remove him as advisor to the Society of Physics Students and the Sigma-Pi-Sigma Honor Society. *Id.* ¶ 106. In response, Sadoqi allegedly falsely accused Frohnhofer of revealing confidential employment records; Fortmann reported this to HR during the 2019–2020 winter break period. *Id.* ¶ 107–08. He also reported Sadoqi in late 2019 for disparaging him in front of his students and for allegedly making sexually inappropriate comments towards Dr. Cevher. *Id.* ¶¶ 109–11.

Fortmann alleges that Sadoqi began to deny him access to start-up research funds in retaliation for his HR complaints, specifically between March and September 2019. *Id.* ¶¶ 112–16. Fortmann states that he was forced to self-fund his research, due to the shortfall in resources from his start-up fund. *See id.* ¶¶ 116–21. Despite this, he received a $2,000 Recognition Award on August 6, 2019, "due to his outstanding work performance." *Id.* ¶ 134.

Sadoqi lobbied the College Personnel Committee ("CPC") and University Personnel Committee ("UPC") — both responsible for evaluating Fortmann's performance — to vote against Fortmann's tenure application and professional advancement. *Id.* ¶¶ 174–75. The CPC declined to renew Fortmann's contract in 2019, after Sadoqi conveyed his lack of support for Fortmann and told him "I am going to get rid of you!" with an obscene gesture. *Id.* ¶ 176, 181–82. Just weeks before the CPC's decision, Sadoqi allegedly told Fortmann that he was "too old to care about research and was no longer interested or capable," and that Fortmann's service would

not be considered for tenure. *Id.* ¶¶ 178–79. Sadoqi also bragged about undermining Fortmann's tenure application during the CPC vote. *See id.* ¶¶ 184–90. SJU Dean Jeffrey Fagen intervened and presented Fortmann's accomplishments to the UPC. *Id.* ¶¶ 191–93. The CPC decision was reversed, and on May 7, 2020, Fortmann's contract for the 2020–2021 school year was unanimously approved. *Id.* ¶¶ 193–94.

From October 2019 to March 2021, Fortmann alleges that Sadoqi subjected him to "excessive and dubious cycles of safety concerns" as he endeavored to install a superconducting magnet for his research. *Id.* ¶ 138. Specifically, he accuses Sadoqi of using his position to frustrate his efforts, by "requiring [him] to install additional unnecessary safety measures . . . not required by industry or research standards [while] other employees were allowed to operate a magnet of similar design and size lacking any industry standard equipment in the same building." *Id.* ¶¶ 139–40. Fortmann's research funds were allegedly used to pay for magnet installation, including by retaining an external company that lacked relevant experience and required Fortmann's help to install the magnet. *Id.* ¶ 158. Sadoqi also delayed installation progress by persuading SJU Dean Gina Florio to move the magnet to a new room, which required costly engineering; this allegedly encumbered the rest of Fortmann's start-up funds. *Id.* ¶¶ 165–69. Fortmann continued to self-fund his research into April 2022. *Id.* ¶¶ 171–72.

Fortmann complained to HR about Defendants' alleged obstructionism[1] in late 2020 into early 2021. *Id.* ¶ 146. He emailed SJU project manager Joseph Hauser on November 19, 2020, to better understand why he was being subject to "scrutinized compliance and safety" requirements. *Id.* ¶ 149. On December 10, 2020, he sent an email to HR with "possible discrimination" in the subject line, complaining of "obstruction in his attempt to install the cryogenic magnet [] due to discrimination against him," unevenly applied safety protocol requirements, and age discrimination. *Id.* ¶ 161–63.

At some point between 2019 and 2022, Sadoqi allegedly summarized and negatively characterized student evaluations of Fortmann; he also assigned Fortmann to a smaller class with only ten students, "which adversely affected [his] employment." *Id.* ¶¶ 201–02. Towards the end of the Fall 2021 semester, Sadoqi "abruptly" required Fortmann to teach a section of University Physics (with fewer than twenty students) instead of his popular College Physics section (with roughly fifty students). *Id.* ¶ 222. According to Fortmann, this switch was "highly unusual" and would "inevitably [] negatively" affect his reviews, due to the higher number of students in his College Physics section. *Id.* ¶¶ 222–24. He reported this incident to Dean Florio on November 8, 2021. *Id.* ¶ 225.

Fortmann followed up with HR on March 29, 2021, regarding his previous complaints, and HR responded on May 10, 2021, stating that "there was insufficient

[1] He also renewed his complaints about Sadoqi's targeting of and"infatuat[ion]" with Cevher. Compl. ¶ 147.

evidence that [Sadoqi] harbored any age bias against [Fortmann] or engaged in any conduct because of [Fortmann's] age and that there was also insufficient evidence that [Sadoqi] violated the non-fraternization prohibition." *Id.* ¶¶ 203–05.

In December 2021, the SJU Liberal Arts Personnel Committee denied Fortmann's request for reappointment. *Id.* ¶¶ 227–28. In February 2022, the UPC — during a nine-person meeting — voted Fortmann out, resulting in the termination of his tenure application and the denial of his reappointment. *Id.* ¶¶ 230–31, 236. Before the UPC vote, Sadoqi allegedly asked Cevher to "find a Turkish professor, so I can tell him not to vote for" Fortmann. *Id.* ¶ 234.

Fortmann committed to a terminal year contract for the 2022–2023 school year, *id.* ¶ 238, but he alleges that he continued to face consequences of Defendants' alleged discrimination. He "experienced a stress-induced fainting event" in March 2022, while on his way to meet with Dean Florio. *Id.* ¶ 261. Defendants finally released his start-up research funds on April 21, 2022; that same day, Dean Florio also informed Fortmann that SJU would "not be moving forward with the installation of [his] instrumentation." *Id.* ¶¶ 239–40. Meanwhile, Fortmann alleges that Sadoqi "regular[ly] and pervasive[ly]" appealed to Assistant Dean Joyce Lawlor for help removing Fortmann, including by asking her why Fortmann was still employed and "acting like nothing happened." *Id.* ¶¶ 264, 271. Additionally, in September 2022, one of Fortmann's colleagues (Dr. Muriel Devi) remarked, "[O]ld researchers can't get published because they have too many enemies." *Id.* ¶ 262.

On November 9, 2022, Fortmann emailed HR and complained about the "blatant and persistent retaliation that impeded [his] research." *Id.* ¶ 265 (alteration in original). This email was forwarded to Danielle Haynes, Director of Equal Opportunity, Compliance, and Title IX Coordinator. *Id.* ¶ 266. Fortmann met with Haynes in November and December 2022 and emailed her on December 9, 2022 — at all times complaining of Defendants' discrimination. *See id.* ¶¶ 266–68. On January 3, 2023, Haynes informed Fortmann that her office lacked jurisdiction over his complaint. *Id.* ¶ 270. That same day, Fortmann was also told (it is not clear by whom) that his complaint "'did not articulate' a violation of [the] University's Policy against Bias, Discrimination, and Harassment, and that the matter was 'closed with no further action.'" *Id.* ¶ 275. Fortmann also emailed HR on August 7, 2023, regarding Sadoqi's alleged "extreme and prolonged sexual harassment and victimization" of Cevher. *See id.* ¶¶ 276–77. Fortmann states that Defendants ignored his email and "took no immediate corrective action to address the situation."[2] *Id.* ¶ 278.

### *B. Factual Allegations Regarding Dr. Cevher*

Dr. Cevher began employment as an Adjunct Associate Professor within the SJU Department of Physics around August 2018. *Id.* ¶ 283. She initially worked part-time and reported directly to Sadoqi. *Id.* ¶ 285, 287. She alleges that Sadoqi subjected her to *quid pro quo* harassment and sex-based discrimination "on a regular and pervasive basis," beginning in around November 2018. *Id.* ¶ 289. Specifically,

[2] SJU allegedly did not interview Fortmann about his August 7, 2023 complaint until March 28, 2024, after he retained counsel for the present matter. Compl. ¶ 484.

she asserts that Sadoqi "subjected [her] to unwelcome sexual conduct, and her reaction [to] that conduct was then used as the basis for his decisions affecting her compensation, terms, conditions and privileges of her employment at [SJU]." *Id.* ¶ 290.

Sadoqi started to make Cevher uncomfortable when he began entering her classrooms, uninvited, while she was teaching and staring at her up and down. *Id.* ¶ 293. On November 29, 2018, Sadoqi asked Cevher into his office and discussed his children and dissolving marriage, stating, "I need someone in my life to love me and take care of me." *Id.* ¶¶ 289–99. He asked to continue the conversation over dinner the following evening, and Cevher agreed because "she did not know what else to do." *Id.* ¶ 301.

The next day, Cevher met Sadoqi at a lower Manhattan restaurant and describes him as having had "a few alcoholic beverages" and being "flirtatious." *Id.* ¶ 302. After they exited the restaurant, Sadoqi followed Cevher to the train station and insisted on giving her a ride, despite her maintaining that she preferred the subway. *Id.* ¶¶ 303–04. Sadoqi then grabbed her and kissed her on the lips. *Id.* ¶ 305. Cevher alleges that Sadoqi refused let her ride the subway and that she "felt pressured to get into his car." *Id.* ¶ 306. When Sadoqi arrived at her house — as Cevher tried to leave his car — he allegedly "took her head in his hands and forced it towards his groin." *Id.* ¶ 307.

Cevher states that this incident left her "emotionally distraught" and prompted her to limit her time within the department and immediately seek

employment with New York University ("NYU"). *Id.* ¶ 309–11. Sadoqi frequently demanded to drive her home from work, and Cevher complied, "[i]n fear of losing her job." *Id.* ¶ 312.

During the winter break, Sadoqi asked Cevher to help him with a book translation project. *Id.* ¶ 313. While they worked together, Sadoqi allegedly "touched [Cevher's] legs and kissed her neck" and ignored her objections. *Id.* ¶ 314–15. He also repeatedly took her to restaurants, including those in hotel lobbies, and waited outside her home — sometimes for hours — to give her rides. *Id.* ¶¶ 316–17; *see also id.* ¶ 322 (alleging that Sadoqi waited for two hours outside Cevher's accountant's office, as Cevher met with her accountant inside, before demanding to give her a ride). On New Years Eve, Sadoqi brought Cevher to a motel room, began kissing her, and sexually propositioned her. *Id.* ¶ 318. Cevher refused to engage in a sexual relationship with Sadoqi, and she further limited her presence within the department after they completed the book project, including by cancelling classes. *Id.* ¶¶ 318–19, 321.

Cevher alleges that Sadoqi interfered with her ability to obtain employment at NYU, while continuing to kiss and inappropriately touch her. *See id.* ¶¶ 323–25. She began to use different university entrances in order to avoid interacting with Sadoqi. *Id.* ¶ 326. In February 2019, Sadoqi offered Cevher a one-year, non-tenure track position; she initially declined this offer and angered Sadoqi in the process. *See id.* ¶¶ 327–31. After Sadoqi allegedly "begged" Cevher for two weeks to reconsider, she accepted the offer on March 5, 2019. *Id.* ¶ 335.

In June 2019, Cevher obtained her driver's license, and Sadoqi began demanding rides from her after crashing his car. *Id.* ¶¶ 339–40. She states that she "felt like she could not say 'no,'" because Sadoqi had secured a summer teaching position for her. *See id.* ¶ 341. While she was driving, Sadoqi would comment that she had "amazing legs" and call her "sexy" and "beautiful." *See id.* ¶ 342. Once, as they walked towards campus together, Sadoqi slowed down and said, "Keep walking! I just want to see your nice figure from far away!" *Id.* ¶ 343.

In September 2019, Sadoqi presented his divorce paperwork to Cevher and offered her an engagement ring, which she rejected; he also stated that he "want[ed] to have a male child" with Cevher. *Id.* ¶¶ 346–47. Throughout Fall 2019, Sadoqi worked with only Cevher on projects for the Physics Department, during which "he touched her and continued to make inappropriate comments about her body." *Id.* ¶¶ 350–52. On one occasion in his office, Sadoqi jumped on top of Cevher, pushed her onto the couch, and "pushed his body onto her body." *See id.* ¶¶ 354–57. He promised never to do such a thing again, after Cevher objected and pushed him away. *See id.* ¶¶ 358–60.

Sadoqi's behavior allegedly continued during Cevher's trip to Turkey, which Sadoqi joined, from mid-December 2019 to January 2020[3]; according to Cevher, he "would not leave [her] alone" and continued "making inappropriate comments and

[3] It is not clear why Sadoqi joined Cevher on this trip. Cevher alleges that she traveled to Turkey because "she wanted to move back there to escape the ongoing sexual abuse." Compl. ¶ 361. Sadoqi traveled to Turkey as well, but he and Cevher "paid each for their own tickets and accommodations [and t]hey stayed in separate rooms." *Id.* ¶ 362.

touching her." *Id.* ¶¶ 361–62. From March to April 2020, during the COVID-19 pandemic lockdown, Cevher rented an apartment from Sadoqi. *Id.* ¶ 364–65. Once, when he came to collect the rent, Sadoqi "slapped her behind." *Id.* ¶ 366. After she moved out, Sadoqi moved into the apartment and gave her a spare key. *Id.* ¶ 368. Cevher alleges that throughout 2020 and into 2021, Sadoqi "continue[d] to sexually harass her" and "touch [her] inappropriately" on multiple occasions. *See id.* ¶¶ 370–78. On February 4, 2021, she emailed Sadoqi to ask for space and to "[n]ot contact [her] unless it is about work." *Id.* ¶ 381.

In March 2021, Cevher was offered a promotion to tenure-track Assistant Professor position and was recommended for the Clare Boothe Luce Award by Dean Florio. *Id.* ¶ 382. Again, she initially declined the offer and Sadoqi "begged" her to reconsider.[4] *Id.* ¶¶ 383–84. Also during this time, HR began an investigation into Sadoqi, who instructed Cevher to "deny his sexually harassing conduct" and "demanded to be present secretly" at her interview with HR. *See id.* ¶¶ 385–86, 388–91. She agreed to follow his instruction "[i]n fear of retaliation." *Id.* ¶ 391.

Sadoqi continued to comment on Cevher's body, including in the Spring and Summer of 2021. *See id.* ¶¶ 395–96 (alleging that Sadoqi "stared at her nonstop, looked her up and down" and called her "sexy" while she assembled equipment (citation modified)). On November 22, 2021, he remarked that Cevher looked "so beautiful today" and "smell[ed] so good"; he also told her, "Soon, I will get a job in

[4] It is not clear when or whether Cevher accepted this offer, but she remained employed at SJU after this time.

Morocco, [I] will be the King's advisor and take you with me!" *Id.* ¶ 401. Thereafter, Sadoqi regularly called Cevher "beautiful" and "sexy" and promised to take her to Morocco. *See id.* ¶¶ 404–05. In December 2021, Sadoqi came into Cevher's lab and "kept staring at her body" and called her "[s]ooo hot!" *Id.* ¶¶ 407–08. He also allegedly "rubbed against her body while passing back and forth in the lab," and when Cevher attempted to check the pressure inside a box of gloves, he said, "Mmmm[, y]ou like rubbing those, don't you?" *Id.* ¶¶ 408–09. On January 17, 2022, while they were both inside a cold car, Sadoqi "pushed his hand between [Cevher's] legs to warm them up." *Id.* ¶ 411.

On January 18, 2022, Cevher emailed Sadoqi stating that "he 'made her feel very uncomfortable,'" that "she was not interested in him," and that "[he] was 'using his authority over [her] to push her into a relationship." *Id.* ¶¶ 412–13 (citation modified). On February 20, 2022, she emailed him again and stated, "I am not at [SJU] to form a relationship with you!" *Id.* ¶ 419. She further warned him that "if he '[could not] maintain professional boundaries, she would report his behavior to HR.'" *Id.* (citation modified). Again, on April 24, 2022, Cevher emailed Sadoqi and asked him to "stop coming to [her] classes" and to "leave [her] alone on campus." *Id.* ¶ 423.

Yet, Sadoqi continued to comment on Cevher's body and insist on engaging in a romantic relationship with her. *See id.* ¶ 424 (commenting, on May 25, 2022, that Cevher looked "beautiful" and "so hot"; had "an amazing body" and "[a]n amazing ass"; and that he would take her with him to Morocco), ¶ 426 (stating that he and

Cevher would be together, on July 11, 2022), ¶ 428 (remarking, on September 21, 2022, that Cevher looked "so sexy" and that he remained in the United States to be with her), ¶¶ 449–453 (offering Cevher an engagement ring in November 2022). On July 12, 2022, Cevher sent a WhatsApp message to Sadoqi to ask him to stop his behavior: "So many times I [have] told you that I am not interested in you. Every time I come to speak with you with good faith, you sexualize conversations, and hit on me. You make me feel uncomfortable!" *See id.* ¶ 427. She messaged him again on September 22, 2022, and objected to him "hang[ing] out with [her]" in the department. *Id.* ¶ 429.

In September 2022, Sadoqi became infatuated with a new faculty member (Dr. Emine Karaman), who had recently joined the department. *See id.* ¶ 433. At one point, he "attempted to use [] Cevher's funds to purchase [Karaman's] laboratory supplies." *Id.* ¶ 435. On September 26, Cevher was blamed by administrators for a paperwork mistake; when she asked Sadoqi to clarify the guidelines for the paperwork, he refused — allegedly "[i]n retaliation . . . for refusing his sexual advances." *Id.* ¶¶ 439–41. This left Cevher unsure of whom she should contact for specific tasks, such as hiring a student — which took her one month to complete and "destroyed the momentum of her research." *Id.* ¶¶ 442–44.

In October 2022, Sadoqi and the department secretary began excluding Cevher from work-related emails; she was also "cut off" from emails relating to official communication guidelines. *Id.* ¶¶ 445–47. On December 9, 2022, Cevher complained to Sadoqi that he "was retaliating against her [after] 'she said no' to his sexual

advances." *Id.* ¶ 463. She further complained to HR about his alleged retaliation on February 2, 2023, and May 4, 2023, but "to no avail." *Id.* ¶¶ 448, 464. At some point, Sadoqi began to ignore Cevher's work-related inquiries, to come into her office unannounced to yell at her, and to chastise her in front of other faculty members. *Id.* ¶¶ 455–56, 466. He also "falsely accused" her of threatening him and other SJU employees. *Id.* ¶ 462.

Sadoqi began comparing Cevher to another recently fired faculty member and promising to "take care of [her]" in a similar fashion. *See id.* ¶ 465. Beginning on March 3, 2023, he refused to provide her with the space necessary for her research equipment, whereas he renovated a room for Karaman, who was not obligated to conduct research. *See id.* ¶¶ 467–70. He also increased Cevher's teaching days from three to five days a week. *Id.* ¶ 472. Cevher complained to Dean Teresa Delgago on March 21, 2023, stating, "Every time I try to speak with the Chair, he raises his voice, bullies and threatens me." *Id.* ¶ 474. She alleges that her complaints were ignored and that Sadoqi's sexual harassment continued. *See id.* ¶ 475.

On July 27, 2023, SJU "plac[ed] a time limit on [Cevher's] spendings" and required her to exhaust her start-up funds within the next nine months. *Id.* ¶ 480. Cevher asserts that spending her $50,000 worth of funds within a nine-month period forced her to use degraded chemicals that yielded null results. *See id.* ¶ 481.

On September 8, 2023, Cevher reported Sadoqi to the SJU Department of Public Safety and asked officers to dispatch a security guard to witness his harassing conduct; a Public Safety employee filed an HR complaint on Cevher's behalf. *See id.*

¶¶ 486–87, 492. On September 25, she emailed HR, asking them to "respond to the nine complaint letters [she] submitted in the Spring Semester[]" and mentioning her many meetings with HR that "obtained no results." *Id.* ¶¶ 488–89. On October 16, 2023, HR informed Cevher that SJU was unable to substantiate her September 8, 2023 harassment claims against Sadoqi. *Id.* ¶ 491.

Cevher renewed her HR complaints on October 17, 2023, accusing Sadoqi of "sexually harassing her since 2018," "push[ing] her to have a relationship with him," and retaliating against her after she refused his marriage proposal. *Id.* ¶ 494 (citation modified). She also complained to Danielle Haynes, Director of Equal Opportunity, Compliance, and Title IX Coordinator, that "every time Sadoqi speaks to her, he makes sexual comments about her body." *Id.* ¶ 495 (citation modified).

On October 24, 2023, Cevher submitted a formal complaint and requested a No Contact Order against Sadoqi. *Id.* ¶ 496. She alleges that Sadoqi "misrepresented [her] student evaluations" in retaliation. *Id.* ¶¶ 497–98. She also complained on November 8, 2023, about Sadoqi hiring a male professor who allegedly made sexist and inappropriate comments about women. *Id.* ¶¶ 499–05. A No Contact Order was issued on November 13, 2023, which obliged Cevher "to refrain from engaging in any non-work-related communications or one-on-one in-person meetings with [] Sadoqi." *Id.* ¶ 507. That same day, Cevher submitted another written complaint about Sadoqi's alleged harassment and negative comments toward Fortmann (although it is not clear to whom she complained). *Id.* ¶¶ 508–10. A week later, on November 20, 2023, SJU informed Cevher that it had begun an investigation into one of her sexual

harassment complaints against Sadoqi. *See id.* ¶¶ 511–13. In December 2023, SJU lawyers questioned Cevher for three hours without an attorney or an advisor present on her behalf. *Id.* ¶¶ 514–15. Two months later, in February 2024, Cevher was informed that the University Personnel Committee "rejected her personnel action for reappointment." *Id.* ¶ 516.

## **PROCEDURAL HISTORY**

Fortmann filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") against St. John's University ("SJU") on January 6, 2023, and Cevher filed the same on March 12, 2024. Compl. ¶¶ 4–5, ECF No. 1. Fortmann received a Right to Sue Notice from the EEOC on May 8, 2024, and Cevher received the same on May 15, 2024. ECF No. 1-1; ECF No. 1-2.

Plaintiffs filed the instant action on August 6, 2024. On July 15, 2025, the Court held a pre-motion conference ("PMC") regarding Defendants' anticipated motion to dismiss, during which Plaintiffs clarified that their federal causes of action applied only to SJU. *See* Min. Entry dated July 15, 2026. The parties were instructed to file a joint letter indicating, *inter alia*, whether Plaintiffs planned to withdraw any causes of action from the Complaint and the status of obtaining Fortmann's EEOC charge materials. *See id.*

On August 25, 2025, the parties submitted a joint letter in which Fortmann indicated that he declined to withdraw his Title VII and ADEA discrimination claims, as well as his Title IX retaliation claim. ECF No. 13 at 1–2. Cevher agreed to pursue her Title VII sex discrimination and *quid pro quo* claims based solely on events that took place after May 17, 2023. *See id.* at 1. Plaintiffs also provided supplemental

EEOC charge materials, including an email from Fortmann to Alexander Adeschenko of the EEOC, dated January 12, 2024. ECF No. 13-2.

On August 29, 2025, the Court imposed a briefing schedule for SJU's motion to dismiss, and it advanced the parties' deadline to file a joint status letter regarding the EEOC charge materials to October 6, 2025. Dkt. Order dated Aug. 29, 2025. After SJU filed a consent motion for an extension of time, ECF No. 15, the parties timely filed their joint submission on October 13, 2025, ECF No. 16. Fortmann expressed his intent to maintain his religious discrimination claims, and SJU indicated that it would maintain its arguments about Fortmann's failure to administratively exhaust such claims. *Id.* at 1–2.

SJU's instant motion to dismiss includes as exhibits copies of Fortmann's EEOC Charge of Discrimination dated February 6, 2023, ECF No. 21-2; Cevher's EEOC Charge dated March 12, 2024, ECF No. 21-3; a September 6, 2023 email from Fortmann to Andrea Macancela of the EEOC, regarding Sadoqi's alleged religious discrimination — along with a Happy Hannukah card from one of his colleagues, *see* ECF No. 21-5; and a printout of Cevher's faculty profile on the SJU website, *see* ECF No. 21-6.

Plaintiffs' opposition includes copies of Fortmann's EEOC Inquiry dated January 6, 2023, ECF No. 23-1; Fortmann's January 12, 2024 email to Alexander Adeschenko, ECF No. 23-2; and Cevher's written complaint to SJU dated November 13, 2023, ECF No. 23-3.

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), the Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.* (quoting *Twombly*, 550 U.S. at 556), and "[f]actual allegations [that are] enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555. Along with the complaint and documents it incorporates by reference, the Court may consider "documents 'integral' to the complaint and relied upon it." *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

## **DISCUSSION**

SJU asks the Court to dismiss virtually all of Plaintiffs' state and federal claims, with the exception of Fortmann's hostile work environment claims under the NYSHRL and NYCHRL (Counts Eight and Eleven) and Cevher's hostile work environment claims under Title VII, the NYSHRL, and the NYCHRL (Counts Two, Eight, and Eleven). *See* Mem. of Law in Supp. of Def. SJU's Mot. for Partial Dismissal of Pl.'s Compl. ("SJU's Mot. to Dismiss") at 10, ECF No. 20. As for the claims it seeks to dismiss, SJU raises various arguments around administrative exhaustion, timeliness, and Plaintiffs' failure to state a claim.

For the reasons discussed below, the following claims are dismissed: Fortmann's claims for (1) Title VII discrimination, (2) Title VII retaliation, (3) Title VII hostile

work environment, (4) NYSHRL religious discrimination, (5) NYCHRL religious discrimination, (6) ADEA discrimination, (7) ADEA retaliation, and (8) NYSHRL age discrimination. SJU's motion to dismiss is denied as to Fortmann's remaining claims. And the motion is denied in its entirety with respect to Cevher's claims.

***A. Failure to Exhaust Administrative Remedies***

SJU argues that Fortmann's Title VII religious discrimination claims should be dismissed for failure to exhaust administrative remedies, SJU's Mot. to Dismiss at 16, because he failed to include any allegations of religious discrimination in his original EEOC Charge. *Id.* at 17–18.

Before a plaintiff can bring a federal Title VII claim, he must exhaust his administrative remedies: specifically, he must timely file a complaint with the EEOC (*i.e.*, an EEOC charge) and receive a Notice of Right to Sue letter from the agency. *See Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015). However, claims not raised in the EEOC complaint may be incorporated if they are "reasonably related" to those originally filed — in other words, if they challenge conduct that "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Id.* (quoting *Deravin v. Kerik*, 335 F.3d 195, 200–01 (2d Cir. 2003)).

Fortmann contends that his claims of religious discrimination — as included in his emails to EEOC investigators on September 6, 2023 and January 12, 2024, that accuse Sadoqi of falsely labeling him as Jewish — are properly included in this suit because they are reasonably related to the allegations he made in his EEOC Charge.

*See* Mem. of Law in Opp'n to the Def. SJU's Partial Mot. to Dismiss ("Pls.' Opp'n") at 13–14, ECF No. 22.

Fortmann is correct that in some cases, a plaintiff who fails to raise allegations in an EEOC charge may nonetheless include them in a subsequent lawsuit, as long as they are "reasonably related" to claims in the original charge. *Deravin*, 335 F.3d at 201 (citation modified). This exception to the administrative exhaustion requirement "is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering." *Id.* In determining whether a claim is reasonably related to a plaintiff's EEOC charge, "the Second Circuit has instructed district courts to focus on 'the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" *Toney v. Prob. Dep't*, No. 15-CV-0561 (JS) (GRB), 2016 WL 859381, at *3 (E.D.N.Y. Jan. 28, 2016) (quoting *Deravin*, 335 F.3d at 201), *report and recommendation adopted by*, 2016 WL 868206 (E.D.N.Y. Mar. 4, 2016).

Fortmann's EEOC Charge alleges that he was denied access to resources and advancement to tenure, after reporting his supervisor for sexual harassment. ECF No. 21-2 at 2. Age and retaliation are the only bases of discrimination check marked on the form. *Id.* In his EEOC Inquiry, Fortmann names retaliation as the reason for his complaint — specifically, retaliation after reporting Sadoqi for sexual harassment. ECF No. 23-1 at 2–3. Neither document contains a reference to religious

discrimination, and there is nothing in the EEOC Charge or Inquiry to put the agency on notice that Fortmann was allegedly experiencing religious discrimination. *See, e.g.*, *Mercer v. Viacomcbs/paramount*, No. 24-3314, 2026 WL 1782303, at *3 (2d Cir. June 22, 2026) (summary order) (concluding that plaintiff failed to exhaust her claims because her EEOC charge lacked allegations of religious discrimination and she "did not check the box indicating that she was discriminated against on the basis of her religion"); *Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25, 60–61 (S.D.N.Y. 2019) (finding that disability and religious discrimination claims were not reasonably related to age discrimination claims); *Ibraheem v. Wackenhut Servs., Inc.*, 29 F. Supp. 3d 196, 208 (E.D.N.Y. 2014) (finding "[p]laintiff's claims of race and age discrimination [] not reasonably related to his charge of religious discrimination").

Because Fortmann's Title VII religious discrimination claims were not reasonably related to the age and retaliation claims in his EEOC Charge, they are dismissed for failure to exhaust administrative remedies.[5]

---

[5] While Fortmann is not required to exhaust administrative remedies with respect to his NYSHRL and NYCHRL religious discrimination claims, *see Slow v. Prestige Merch. Co.*, No. 08-CV-4425 (FB) (SMG), 2011 WL 4373516, at *3 (E.D.N.Y. Sep. 19, 2011), the Court exercises its discretion to decline to extend supplemental jurisdiction over these claims because they are insufficiently pled, and they raise discrete issues from the federal claims that are before this Court, *see* Compl. ¶¶ 55–61 (alleging that Sadoqi accused Fortmann of "[l]ying about his religion" and "pretending to be Catholic" while secretly being Jewish — without specifying when and in what contexts Sadoqi made such remarks).

Furthermore, in Plaintiffs' opposition, Fortmann contends that he heard Sadoqi's remarks about his religious beliefs "years ago," in 2014. *See* Pls.' Opp'n at 11, 16 n.2. His religious discrimination claims under the NYSHRL and NYCHRL are likely time-barred, even if the Court were inclined to retain jurisdiction over them. *See infra.*

### *B. Time-Barred Claims*

SJU contends that Fortmann's ADEA claims are time-barred insofar as they relate to events prior to April 12, 2022, and that Cevher's Title VII sex discrimination and *quid pro quo* claims are time-barred as to events prior to May 17, 2023. SJU's Mot. to Dismiss at 21–22, 31. As mentioned above, Cevher has agreed to only pursue her *quid pro quo* claim beginning from May 17, 2023.[6] *See* ECF No. 13 at 1.

Fortmann argues that his EEOC Charge was filed on January 6, 2023, and thus, his ADEA claims beginning from March 12, 2022 are timely. Pls.' Opp'n at 16–17. He also maintains that the continuing violation doctrine applies to his claims, because the discrimination he alleges reflects an ongoing "pattern, practice [and] policy of discrimination." *See id.* at 17–20.

#### *1. EEOC Inquiry Form as an EEOC Charge*

Plaintiffs' Title VII and ADEA claims are only viable if they follow an EEOC charge that has been filed within 300 days of any allegedly discriminatory employment action. *See Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) ("Under Title VII, individuals alleging discrimination must file a charge with the EEOC within 180 days or, in states like New York . . . 300 days 'after the alleged unlawful employment practice occurred.'" (quoting 42 U.S.C. § 2000e-(e)(1)));

---

[6] In Plaintiffs' opposition to SJU's motion to dismiss, Cevher argues that the continuing violation doctrine applies to her Title VII *quid pro quo* claims. Pls.' Opp'n at 25–26. It is not immediately clear how Cevher wishes the Court to analyze this argument (*e.g.*, as withdrawing her earlier commitment to only pursue Title VII claims accruing after May 17, 2023). Regardless, for the same reasons why the continuing violation doctrine fails to rescue Fortmann's time-barred ADEA claims, *see infra*, Cevher's reliance on the doctrine is unavailing.

*Hassan v. Ascension Indus.*, No. 25-CV-193 (JLS) (F), 2026 WL 1406679, at *5 (W.D.N.Y. Mar. 24, 2026) ("A plaintiff's ADEA action must be commenced within 180 days of the alleged unlawful practice or if the practice occurred within a state with a cooperative agreement with EEOC for processing charges of discrimination then within 300 days." (citing 29 U.S.C. § 626(d)(1) and *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 213 (2d Cir. 2006)). Discrete discriminatory and retaliatory acts "are 'not actionable if time barred.'" *Banks*, 81 F. 4th at 259 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15, 122 (2002)).

An EEOC inquiry satisfies this test if it is "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008); *see also Littlejohn*, 795 F.3d at 305 n.2 ("When the Intake Questionnaire manifests intent to have the agency initiate its investigatory processes, the questionnaire can itself constitute a charge of discrimination.").

There are a number of reasons to conclude that Fortmann "inten[ded] to activate the administrative process" through his EEOC Inquiry. *See Holowecki*, 552 U.S. at 396. The Complaint alleges that Fortmann filed an EEOC complaint on January 6, 2023, the date on his Inquiry form. Compl. ¶ 4. He included the same allegations in both the Inquiry and the Charge, including the date of the most recent discriminatory employment action (April 21, 2022, the date his start-up funds were unfrozen). *See* ECF No. 21-2 at 2; ECF No. 23-1 at 2–3. Perhaps most importantly,

he included contact information for colleagues who could support his claim and added, "Please encourage them to speak-up for the benefit of those whom [sic] may be victimized in the future." ECF No. 23-1 at 3. Fortmann also offered to "submit a file . . . if further details are helpful or necessary." *Id.* at 4. These facts, taken together, allow the Court to reasonably construe Fortmann's January 6, 2023 Inquiry as an EEOC charge.

*2. Continuing Violation Doctrine*

Fortmann invokes "[t]he continuing violation doctrine, [which] where applicable, provides an 'exception to the normal knew-or-should-have-known accrual date'" for discrimination claims. *Tassy v. Buttigieg*, 51 F.4th 521, 532 (2d Cir. 2022) (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015)).

However, the continuing violation doctrine is not available for Fortmann's claims for discrete discrimination.[7] This conclusion follows the Supreme Court's holding in *Morgan*: "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete

---

[7] By contrast, the continuing violation doctrine is relevant to analyzing hostile work environment claims:

> Their very nature involves repeated conduct . . . . Accordingly, consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period.

*Sutter v. Dibello*, No. 18-CV-817 (SJF) (AKT), 2021 WL 930459, at *13 (E.D.N.Y. Mar. 10, 2021) (quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010)).

discriminatory act starts a new clock for filing charges alleging that act."[8] 536 U.S. at 113. Thus, the Second Circuit has made clear that the continuing violation doctrine "does not apply to 'discrete acts of discrimination or retaliation that occur outside the statutory time period, even if other [related] acts of discrimination occurred within the statutory time period.'" *Id.* (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004)); *see Davis-Garret v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (finding the same with respect to ADEA claims).

The continuing violation doctrine is not available to Fortmann's ADEA claims for discrete acts of discrimination or retaliation. Accordingly — construing his EEOC Inquiry as an EEOC charge and including all claims accruing 300 days before January 6, 2023 — Fortmann's ADEA claims are time-barred prior to March 12, 2022.

### *C. Failure to State a Claim*

SJU moves to dismiss the following claims under Fed. R. Civ. P. 12(b)(6): Fortmann's age discrimination and retaliation claims under the ADEA, NYSHRL, and NYCHRL; Fortmann's Title IX retaliation claim; Cevher's sex discrimination claims under Title IX, the NYSHRL, and the NYCHRL; and Cevher's retaliation claims under Title VII, Title IX, the NYSHRL, and the NYCHRL. *See* SJU Mot. to Dismiss at 22–37.

As discussed above, Fortmann's ADEA claims are time-barred before March 12, 2022, and Cevher's Title VII claims are barred prior to May 17, 2023. Title IX

[8] However, the Supreme Court recognized that time-barred discriminatory acts can serve as "background evidence in support of a timely claim." *Sutter*, 2021 WL 930459, at *13 (quoting *Morgan*, 536 U.S. at 113).

benefits from a three-year statute of limitations period — thus, Plaintiffs' Title IX claims are barred prior to August 6, 2021. *See Harriram v. Fera*, No. 21-CV-3696 (RA), 2023 WL 2647856, at *9 (S.D.N.Y. Mar. 27, 2023); *see also Kane v. Mount Pleasant Sch. Dist.*, 80 F.4th 101, 107–08 (2d Cir. 2023) (applying the state statute of limitations for personal injury actions to Title IX claims).

NYSHRL and NYCHRL claims are similarly subject to a three-year statute of limitations. *Freud v. N.Y.C. Dep't of Educ.*, No. 21-CV-2281 (MKV), 2022 WL 889213, at *6 (S.D.N.Y. Mar. 25, 2022). This period is tolled during the pendency of an EEOC claim. *See Banks*, 81 F.4th at 260. Because 488 days elapsed between Fortmann's EEOC Inquiry (dated January 6, 2023, and construed as an EEOC charge) and his May 8, 2024 Notice of Right to Sue, Fortmann's NYSHRL and NYCHRL claims are time-barred for all acts occurring before April 5, 2020. Likewise, because 64 days elapsed between Cevher's March 12, 2024 EEOC Charge and her May 15, 2024 Notice of Right to Sue, her NYSHRL and NYCHRL claims are time-barred for all acts before June 3, 2021.

Unlike for discrete acts of discrimination and retaliation under Title VII, the "NYCHRL broadly applies the continuing violations doctrine to discrimination, retaliation, and hostile work environment claims where there is 'a consistent pattern or a continuing policy of discriminatory or retaliatory acts.'" *Hinds v. PSEG Long Island LLC*, No. 23-CV-08701 (RER) (LGD), 2026 WL 266010, at *6 (E.D.N.Y. Feb. 2, 2026) (citation omitted); *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12 Civ. 234 (BMC), 2014 WL 5587349, at *4 (E.D.N.Y. Nov. 3, 2014) ("New York courts have held

that the pre-*Morgan*, more generous continuing violations doctrine continues to apply to discrete acts of employment discrimination under NYCHRL." (citation omitted)).[9] Under the continuing violation doctrine, "if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Khan v. Meep N.Y., Inc.*, No. 24-CV-06929 (RER) (RML), 2026 WL 861170, at *8 (E.D.N.Y. Mar. 30, 2026).

Applying the relevant statute of limitations periods to the allegations within the Complaint, the Court dismisses the following claims by Fortmann as time-barred: (1) ADEA discrimination, (2) ADEA retaliation, and (3) NYSHRL age discrimination.

Turning to the merits of Plaintiffs' remaining claims, the following claims by Fortmann survive SJU's motion to dismiss: (1) NYCHRL age discrimination, (2) Title IX retaliation, (3) NYSHRL retaliation, and (4) NYCHRL retaliation. And for the reasons discussed below, the Court denies SJU's motion to dismiss Cevher's claims in its entirety.

1. Discrimination Claims

Federal discrimination claims are analyzed under the burden shifting framework set forth in the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). At the pleading stage, a plaintiff must establish a

[9] The continuing violation doctrine, as it applies to the NYSHRL, remains "coterminous with the scope of the continuing violation doctrine that applies to federal civil rights claims." *Cruz v. City of New York*, No. 21-CV-1999 (DLC), 2021 WL 5605139, at *5 (S.D.N.Y. Nov. 30, 2021).

*prima facie* case of discrimination, *i.e.*, that "(1) [plaintiff] is a member of a protected class; (2) [plaintiff] is qualified for her position; (3) [plaintiff] suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). The pleading standard is met "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 87; *see Back v. Hapoalim*, No. 24-1064-CV, 2024 WL 4746263, at *4 (2d Cir. Nov. 12, 2024) (summary order) (noting that a plaintiff need only plead facts that "give plausible support to a minimal inference of discriminatory motivation" (quoting *Buon v. Spindler*, 65 F.4th 64, 83 (2d Cir. 2023)). As the Second Circuit noted in *Littlejohn*, "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." 795 F.3d at 312 (citation modified).

NYCHRL and NYSHRL claims are construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N.A., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citation omitted); *see Knight v. MTA – N.Y.C. Transit*, No. 19-CV-1428 (PKC) (SDE), 2026 WL 875339, at *2 (E.D.N.Y. Mar. 31, 2026) (describing how the NYSHRL

was amended in 2019 "to align with the NYCHRL's more liberal pleading standard" (quoting *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024)). For discrimination claims, a plaintiff need only show that he or she was treated "'less well than other employees . . . . at least in part *because of*' his or her protected status. *Mihalik*, 715 F.3d at 110 (citation modified) (emphasis in original).[10]

**a. Age Discrimination**

*i. ADEA*

SJU argues that Fortmann's ADEA discrimination claim fails because his only allegation that is not time-barred concerns his colleague Devi's comment that "old researchers can't get published because they have too many enemies." SJU's Mot. to Dismiss at 23 (quoting Compl. ¶ 262). Fortmann contends that his termination, failure to advance to tenure, and lack of access to research funding stemmed from Defendants' age discrimination. Pls.' Opp'n at 20–21.

While the *McDonnell Douglas* burden shifting framework was developed in the Title VII context, it applies to ADEA claims. *See Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012). "In the context of age discrimination claims, an inference of discrimination arises, for example, when the plaintiff is replaced by someone substantially younger." *Tillman v. Grenadier Realty Corp.*, No.

[10] In addition, because the NYCHRL lacks a separate cause of action for hostile work environment, such claims are analyzed as part of NYCHRL discrimination and retaliation claims. *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012). Because Plaintiffs have asserted NYCHRL hostile work environment claims separately — and SJU does not challenge these — the Court does not include them in its analysis of NYCHRL discrimination.

21-CV-4827 (KAM) (MMH), 2024 WL 3758803, at *6 (E.D.N.Y. Aug. 12, 2024) (citation modified).

Fortmann's allegations describing how he was forced to self-fund his own research, *see, e.g.*, Compl. ¶¶ 171–72, 239, 241, and how SJU declined to move forward with his magnet installation, *see id.* ¶ 240, fall within the statute of limitations for ADEA claims — so too does his allegation that his colleague remarked, "[O]ld researchers can't get published because they have too many enemies," *id.* ¶ 262. However, the Complaint does not establish that any of these adverse employment actions stemmed from Defendants' age discrimination. Devi was not Fortmann's supervisor, and the sole comment by Devi appears to have been made in passing. More importantly, Fortmann has not pled any facts supporting the conclusion that Devi's views had any connection with SJU's decisions to restrict Fortmann's research funding and discontinue the magnet installation process. *See id.* ¶¶ 107, 259, 262.

Thus, Fortmann has failed to sufficiently plead an ADEA discrimination claim.

ii. *NYSHRL and NYCHRL*

Given the longer statute of limitations period for the NYSHRL and NYCHRL, many more of the Complaint's allegations can be leveraged in support of Fortmann's age discrimination claims. However, besides the single remark by Devi regarding "old" researchers' challenges in getting their work published, the Complaint lacks allegations of invidious discrimination concerning Fortmann's age, made within the NYSHRL or NYCHRL statute of limitations period. *Cf. id.* ¶ 178 (stating that Sadoqi

told Fortmann in 2019 that he was "too old to care about research and was no longer interested or capable"). Fortmann does mention that he emailed HR on December 10, 2020, stating that the safety protocols with respect to his magnet installation were not "universally applied" and that "he *felt* discriminated against based on his age." *Id.* ¶¶ 162–63 (emphasis added) (complaining that "selective application of safety protocol felt like discrimination because it required him to provide three layers of safety beyond industry standard[s] while ignoring the lack of even the most basic industrial standards elsewhere" (citation modified)). But this amounts to a merely conclusory allegation: Fortmann does not describe how his colleagues, who were subject to less stringent safety standards, benefited because they were younger — nor does he describe how the uneven safety protocol application related to age discrimination within the statue of limitations period. For these reasons, Fortmann has failed to state a claim for age discrimination under the NYSHRL.

However, Fortmann has plausibly alleged age discrimination under the NYCHRL, in light of the fact that the continuing violation doctrine applies to his claims. Fortmann's contention that Defendants discriminated against him based on age — as described in his December 10, 2020 HR complaint — stems from a pattern of alleged discrimination that began in 2018, when Sadoqi called Fortmann "old" and "burned out." *See, e.g.*, *id.* ¶¶ 101, 178. At the pleading stage, these facts are sufficient to demonstrate that Fortmann was treated less well at least in part due to his age. Thus, Fortmann's claim for NYCHRL age discrimination survives SJU's motion to dismiss.

**b. Sex Discrimination**

*i. Title IX Legal Standard*

Title IX claims are subject to the same *McDonnell Douglas* framework as other federal discrimination claims. Title IX prohibits sex discrimination by recipients of federal education funding. It "authorizes private parties to seek monetary damages for intentional violations . . . [and] the private right of action encompasses intentional sex discrimination in the form of a recipient's deliberate indifference to" sexual harassment. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). The Supreme Court and the Second Circuit have recognized that "employment discrimination comes within the prohibition of Title IX." *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 104 (2d Cir. 2022) (quoting *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982)); *see id.* at 106 ("Title IX allows a private right of action for a university's intentional gender-based discrimination against a faculty member.").

A Title IX claim brought under a deliberate indifference theory may be supported by allegations that the funding recipient had actual knowledge of sexual harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1094 (2d Cir. 2024). "To qualify as deliberately indifferent, the recipient's response to sex discrimination must be clearly unreasonable in light of known circumstances." *Id.* at 1094–95 (citation modified).

*ii. Title IX Analysis*

SJU argues that Cevher has failed to sufficiently allege Title IX discrimination because it responded adequately to her complaints of sexual harassment. *See* SJU's Mot. to Dismiss at 32–33. The Court disagrees. The Complaint contains an array of allegations about Defendants' actions and inactions within the limitations period that plainly plead deliberate indifference to Sadoqi's pervasive and ongoing sexual harassment of Cevher.

Cevher's Title IX sex discrimination claims are time-barred prior to August 6, 2021. However, after this point, she repeatedly complained to HR about Sadoqi's sexual harassment and retaliation against her for rejecting his sexual advancements, on February 2, 2023, May 4, 2023, and October 17, 2023. *See, e.g.*, Compl. ¶¶ 448, 464, 494. In March 2023, Cevher also complained to Dean Delgago that Sadoqi "raise[d] his voice, bullie[d] and threaten[ed]" her every time she spoke with him, and in October 2023, she told the Title IX Coordinator (Haynes) that "every time Sadoqi speaks to her, he makes sexual comments about her body." *Id.* ¶ 474, 495 (citation modified). Fortmann also emailed HR on August 7, 2023, concerning Sadoqi's "extreme and prolonged sexual harassment and victimization" of Cevher. *See id.* ¶¶ 276–77

On September 8, 2023, Cevher reported Sadoqi's alleged sexual harassment to the Department of Public Safety, and a Public Safety employee filed a complaint with HR on her behalf. *Id.* ¶¶ 486–87, 92. On October 6, 2023 — after Cevher inquired about her "nine [HR] complaint letters" submitted over the Spring Semester — HR told Cevher that SJU was unable to substantiate her September 8, 2023 harassment

complaint. *Id.* ¶¶ 488, 491. Cevher also submitted a formal complaint to SJU on October 24, 2023, and a No Contact Order was issued *against her* on November 13, 2023. *Id.* ¶¶ 496–98, 507–10. It was not until November 20, 2023 that SJU launched an investigation into one of her complaints (presumably the formal complaint filed on October 24, 2023). *See id.* ¶¶ 511–13. As part of this investigation, SJU's lawyers questioned Cevher for three hours without an attorney or advisor present on her behalf. *Id.* ¶¶ 514–15.

Thus, SJU is incorrect that "Cevher does not allege that she made any [] reports to the University regarding Sadoqi's alleged sexual harassment" prior to September 8, 2023. SJU's Mot. to Dismiss at 33. Within the statute of limitations, Cevher complained about Sadoqi's behavior as early as February 2023, yet SJU did not begin an investigation into her claims until November 2023. It is also not clear that SJU conducted any inquiry into the September 8, 2023 complaint on her behalf before concluding that it was "unable to substantiate" the allegations.

The cases SJU cites in support of its motion are inapposite. *See* SJU's Mot. to Dismiss at 33; Reply Mem. of Law in Further Supp. of Def. SJU's Partial Mot. to Dismiss Pls.' Compl. ("Reply") at 12–13, ECF No. 24. In *Morin v. Fordham Univ.*, the university "promptly" suspended — and ultimately terminated — the alleged sexual harasser and "promptly" interviewed (*i.e.*, within a month) multiple students and faculty as part of its investigation. No. 21-CV-7909 (NSR), 2022 WL 4586042, at *2–3, 8 (S.D.N.Y. Sep. 28, 2022); *see also KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, No. 12-CV-2200 (ER), 2013 WL 177911, at *6–7 (S.D.N.Y. Jan. 16, 2013)

(offering a sexual assault victim psychiatric evaluation, resources regarding the Title IX grievance process, and home instruction upon receiving notice of the assaults). In contrast, Cevher alleges that she filed nine HR complaints "to no avail," *see* Compl. ¶ 448, and that it took nearly a year for SJU to investigate her complaints. When SJU finally *did* launch its investigation, it subjected her to extensive questioning without access to a representative. And finally, when the university took "remedial action," it did so *against* Cevher instead of Sadoqi, and he remains chair of the Physics Department to this day.[11]

These facts, taken together, sufficiently allege that SJU acted with deliberate indifference to Cevher's complaints of sexual harassment. Thus, SJU's motion to dismiss is denied with respect to her Title IX discrimination claim.

*iii. NYSHRL and NYCHRL*

Because Cevher has sufficiently pleaded a claim for Title IX discrimination, the Court finds that she has adequately pleaded corresponding claims under the NYSHRL and NYCHRL. *See Doe v. N.Y. Univ.*, No. 20-CV-01343 (GHW), 2021 WL 1226384, at *24 (S.D.N.Y. Mar. 31, 2021).

2. <u>Retaliation Claims</u>

To bring retaliation claims under Title VII, the ADEA, and Title IX, a plaintiff must allege that "(1) [he or she] participated in a protected activity; (2) the employer knew of [his or her] protected activity; (3) [he or she] was subjected to an adverse

---

[11] *See Mostafa Sadoqi*, St. John's Univ., https://www.stjohns.edu/academics/faculty/mostafa-sadoqi (last visited Sep. 28, 2026).

employment action; and (4) there was a causal connection between the participation in the protected activity and the adverse employment action." *Ninying v. N.Y.C. Fire Dep't*, 807 F. App'x 112, 115 (2d Cir. 2020) (summary order) (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)); *see Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011) (adopting the Title VII retaliation standard in the Title IX context).

Protected activity can include "opposing an unlawful employment practice or otherwise making a charge, testifying, assisting, or participating 'in any manner in an investigation, proceeding, or hearing.'" *Banks*, 81 F.4th at 275; *see also Sutter*, 2021 WL 930459, at *29 ("Protected activity includes 'the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management . . . .'" (quoting *Matima v. Celli*, 228 F.3d 68, 78-79 (2d Cir. 2000)). Furthermore, a plaintiff need only have a "good faith reasonable belief that the underlying challenged actions of the employer violated the law" to allege a protected activity. *Richards v. Dep't of Educ.*, No. 21-CV-338 (LJL), 2022 WL 329226, at *16 (S.D.N.Y. Feb. 2, 2022).

"In the context of a Title VII retaliation claim, an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Newton v. LVMH Moët Hennessy Louis Vuitton Inc.*, --- F.4th ---, 2026 WL 2819692, at *7 (2d Cir. Sep. 21, 2026) (citation modified) (quoting *Vega*, 801 F.3d at 90). Furthermore, "[a] causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed

closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319; *Vega*, 801 F.3d at 90.

For retaliation claims under the NYSHRL and NYCHRL, a plaintiff must establish that he or she "took an action opposing [his or her] employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112.

**a. Age Discrimination**

*i. ADEA*

As discussed above, Fortmann's ADEA claims are time-barred for events occurring prior to March 12, 2022. Within the statute of limitations period, Fortmann alleges that his start-up funds were encumbered until April 21, 2022, and that SJU informed him that it would discontinue his magnet installation on that same date. Compl. ¶¶ 239–40. He also alleges that he emailed HR on November 9, 2022, to complain about the "blatant and persistent retaliation that impeded his research." Compl. ¶ 265. This email was forwarded to the Title IX Coordinator (Haynes), and Fortmann further complained to her on December 9, 2022, about "being singled out," "retaliation," "discrimination," "disparate treatment," and Defendants' discriminatory practices. *See id.* ¶¶ 267–68.

It is not clear from these allegations whether Fortmann engaged in protected activity specifically challenging Defendants' age discrimination. However, even assuming that Fortmann challenged SJU's age-related discriminatory employment actions, within the ADEA statute of limitations, the adverse employment action he experienced (*i.e.*, restricted access to his start-up research funding) began *before* such complaints were made.[12] *See Richards*, 2022 WL 329226, at *17 (finding that a workload increase that was announced before the plaintiff's complaint could not "raise the inference that the allegedly retaliatory change was causally linked to [p]laintiff's complaint"); *Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) ("There can be no inference of retaliation where the protected activity occurred after the adverse employment action.").

Furthermore, Fortmann does not sufficiently allege that SJU's decision to cease magnet installation was causally connected to protected activity challenging age discrimination. It lacks a temporal nexus with any of Fortmann's complaints to HR or members of SJU's administration. *See, e.g.*, Compl. ¶¶ 203–05 (complaining of Sadoqi's age bias in March and April 2021). In fact, the decision appears to have

[12] It is not even clear that SJU's restriction on Fortmann's start-up funds constitutes retaliation within the statute of limitations period. Fortmann repeatedly alleges that SJU retaliatorily encumbered his start-up funds before March 2022. *See, e.g.*, Compl. ¶ 171 ("From March 2021 to April 21, 2022, in further retaliation against Dr. Fortmann, the Defendants caused Dr. Fortmann to self-fund his own research, which no one else has ever been asked to do."). If "each discrete [act of retaliation] starts a new clock for filing charges alleging that act," *Morgan*, 536 U.S. at 113, and Fortmann alleges that SJU restricted his funding access before March 2022, then he failed to bring a timely claim regarding such retaliation.

simply followed the UPC vote to deny Fortmann tenure and Fortmann's choice to enter a terminal year contract for 2022–2023. *See id.* ¶¶ 231–32, 236, 238–40.

Thus, SJU's motion to dismiss is granted with respect to Fortmann's ADEA retaliation claim.

*ii. Title IX*

Fortmann's Title IX retaliation claim can be supported by allegations beginning as early as August 6, 2021. Such facts include: Sadoqi's late Fall 2021 decision to assign Fortmann to a University Physics section (from a College Physics section) in the middle of a two-semester sequence, *id.* ¶¶ 222–24; the December 2021 vote by the Liberal Arts Personnel Committee to deny his reappointment, *id.* ¶¶ 227–28; the February 2022 UPC vote to terminate his tenure application, *id.* ¶¶ 230–32; and SJU's decision to cease his magnet installation on April 21, 2022, *id.* ¶ 240.

It is not clear how Fortmann's reassignment to the University Physics section "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 57; *see Harris v. N.Y.C. Hum. Res. Admin.*, No. 20-CV-2011 (JPC), 2022 WL 3100663, at *10 (S.D.N.Y. Aug. 4, 2022) (distinguishing "mere inconveniences or alterations of job responsibilities" from "materially adverse changes in the terms and conditions of employment" (citation modified)). Indeed, Fortmann quickly reported this incident to HR on November 8, 2021. *Id.* ¶ 225.

In contrast, termination and failure to promote can constitute discrete acts of retaliation. *See Davis-Garett*, 921 F.3d at 42. In Fortmann's case, the denial of his reappointment in December 2021, and his tenure denial in February 2022, followed

his HR complaints in March and April 2021, reporting Sadoqi for his allegedly discriminatory comments towards his female student.[13] *See* Compl. ¶¶ 84–89, 203–05 (calling HR after Sadoqi accused his student of lying and flirting with professors). The temporal relationship — *i.e.*, the eight-month gap — between Fortmann's protected activity and the alleged retaliation is too attenuated to establish causation through temporal proximity. *See Suarez v. City of New York*, Nos. 11-CV-5812 (WFK) (VMS) and 14-CV-5403 (SLT) (VMS), 2019 WL 13273450, at *15 (E.D.N.Y. June 10, 2019) (acknowledging that "[t]he Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship" but "district courts . . . have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation").

However, Fortmann has sufficiently alleged retaliatory animus. Sadoqi was aware of Fortmann's March and April 2021 HR complaints reporting Sadoqi's alleged sex discrimination, at the time that he campaigned against Fortmann's tenure vote. *See* Compl. ¶ 207 ("[O]n April 8, 2021, [Fortmann] emailed [HR] and informed [HR] that [Sadoqi] was *asking faculty if they had gotten an email from HR* and talking to those who ha[d]." (citation modified)). Fortmann states that before the UPC vote denying him tenure, Sadoqi "was openly trying to get the contact information of the committee members who are in charge of deciding whether a candidate gets

[13] While these complaints were made before the August 6, 2021 statute of limitations period began, they serve as background to support Fortmann's timely retaliation claims. *See Morgan*, 536 U.S. at 113.

reappointed for the following year" and told Cevher to "find a Turkish professor, so I can tell him not to vote for [Fortmann]." *Id.* ¶¶ 233–34 (citation modified). He also allegedly told Cevher in 2022 that "he always spoke negatively to the committees so they would vote against [Fortmann]." *Id.* ¶ 235. Giving Fortmann the benefit of all favorable inferences from these facts, this is sufficient to allege that the decision to deny Fortmann tenure stemmed from retaliatory animus, as a result of his protected activity (HR complaints) challenging sex discrimination.

Thus, SJU's motion to dismiss is denied with respect to Fortmann's Title IX retaliation claim. As before, because Fortmann's Title IX retaliation claim is sufficiently pled, the Court finds that he has adequately pleaded corresponding claims under the NYSHRL and NYCHRL.

**b. Sex Discrimination**

*i. Title VII*

Cevher's Title VII claims are time-barred prior to May 17, 2023. After this point, she alleges that SJU engaged in the following acts of retaliation: requiring her to exhaust her start-up funds within nine months, on July 27, 2023, *id.* ¶ 480; and denying her reappointment in February 2024, *id.* ¶ 516.

Cevher complained about Sadoqi's "bullying" and "threatening" behavior to HR on March 21, 2023; she also alleges that Sadoqi's behavior was in retaliation for rejecting his sexual advances and that her HR complaint was ignored, "empower[ing Sadoqi] to continue the sexual harassment." *Id.* ¶¶ 472–75. She further became

"reluctant to go to HR, because [Sadoqi] regularly bragged to her that going to HR was futile." *Id.* ¶ 476.

Cevher also reported Sadoqi's sexual harassment to the Department of Public Safety in September 2023, and an HR complaint was subsequently filed on her behalf. *Id.* ¶¶ 486–87. She followed up on this HR report on September 25, 2023, and on October 17, 2023, she further complained that Sadoqi had "been sexually harassing her since 2018." *Id.* ¶¶ 488–89, 494–95. Cevher formally complained to SJU on October 24, 2023, requesting a No Contact Order. *Id.* ¶ 496. On November 8, 2023, she also complained about Sadoqi hiring a male professor who allegedly made sexist and inappropriate comments about women, and on November 13, 2023, she complained again, in writing, about Sadoqi's sexual harassment. *See id.* ¶¶ 499–05, 508–09.

These facts, taken together, sufficiently plead a claim for Title VII retaliation. Cevher alleged that "[s] pending all her funds, worth more than $50,000 within nine-months meant she had to use degraded chemicals which would give her no results." *Id.* ¶ 481. Thus, SJU took adverse employment actions that undermined her research and resulted in her eventual termination. She did not complain about Sadoqi's "bullying" behavior in a vacuum, as SJU suggests. *See* SJU's Mot. to Dismiss at 37 (insisting that "there is no allegation that [Cevher's Spring 2023 HR] letters included any reports of Sadoqi having harassed or discriminated against her based on her sex"). For she has clearly alleged that HR's inaction in the wake of her complaint only emboldened Sadoqi to continue his sexual harassment, and that he continued to

engage in bullying behavior in retaliation for rejecting his sexual advances. *See id.* ¶ 472.

Moreover, there is enough temporal proximity between her March 2023 complaint and the limits placed on her research funds in July 2023. *See, e.g.*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").

SJU is also mistaken in arguing that there is a lack of temporal proximity between Cevher's September 2023 report to the Department of Public Safety and the denial of her reappointment in February 2024. *See* SJU's Mot. to Dismiss at 27. Said report was followed by HR complaints in October and November 2023 about Sadoqi's sexually discriminatory behavior. *See* Compl. ¶¶ 496, 499. There is no dispute that *SJU* was aware of Cevher's complaints, and her October and November 2023 complaints are temporally proximate to her termination, so as to support an inference of causation. Thus, SJU's motion to dismiss is denied with respect to Cevher's Title VII retaliation claims.

*ii. Cevher's Remaining Sex-Based Retaliation Claims*

Because Cevher has stated a claim for retaliation under Title VII, she has sufficiently pleaded retaliation under Title IX, as well as the NYSHRL and NYCHRL.

## **CONCLUSION**

For the foregoing reasons, the Court grants SJU's motion to dismiss in part and denies it in part. The Court hereby dismisses the following claims by Fortmann: (1) Title VII discrimination, (2) Title VII retaliation, (3) Title VII hostile work environment, (4) NYSHRL religious discrimination, (5) NYCHRL religious discrimination, (6) ADEA discrimination, (7) ADEA retaliation, (8) NYSHRL age discrimination. Furthermore, Fortmann's ADEA claims are time-barred before March 12, 2022, and (as previously conceded by Cevher, *see supra* n.6) Cevher's Title VII claims are barred prior to May 17, 2023.

Plaintiff Fortmann's causes of action are dismissed as follows:

- First Cause of Action (Title VII Discrimination): DISMISSED with respect to Fortmann.
- Fourth Cause of Action (Title VII Retaliation): DISMISSED with respect to Fortmann.
- Fifth Cause of Action (ADEA Discrimination): DISMISSED.
- Sixth Cause of Action (ADEA Retaliation): DISMISSED.
- Seventh Cause of Action (NYSHRL Discrimination): DISMISSED with respect to Fortmann.

SJU's motion to dismiss the remainder of Plaintiff Fortmann's claims is denied, and its motion to dismiss Plaintiff Cevher's claims is denied in its entirety.

**SO ORDERED.**

*/s/ Nina R. Morrison*
Nina R. Morrison
United States District Judge

Dated: September 29, 2026
Brooklyn, New York